IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Donald Sheets,                                    :
                        Plaintiff                 :      Civil Action 2:04-cv-629

             v.                                   :      Judge Marbley

Jo Anne B. Barnhart,                              :      Magistrate Judge Abel
Commissioner of Social Security,
                        Defendant                 :

### Report and Recommendation

Plaintiff Donald Sheets brings this action under 42 U.S.C. §§405(g) and 1383(c)(3)

for review of a final decision of the Commissioner of Social Security denying his

application for Social Security disability and Supplemental Security Income benefits.

This matter is before the  Magistrate Judge for a report and recommendation on the

parties' cross-motions for summary judgment.

**<u>Summary of Issues.</u>**

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because the administrative law judge failed to:

- Determine that Sheets' stomach impairment was not a medically determinable impairment;

- Consider the combined impact of Sheets' multiple impairments;

- Weigh the opinions of Sheets' treating and examining physicians properly; and,

- Evaluate Sheets' credibility properly.

**Procedural History.**  Plaintiff Donald Sheets filed his application for disability insurance benefits on August 2, 2001, alleging that he became disabled on December 1, 1998, at age 43, by nerves, blurred vision, tunnel vision, stomach problems, blood in bowel movements, and knee problems.  (R.  59-61, 73.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On February 6, 2003, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R.  466.)  A vocational expert also testified.  On April 21, 2003, the administrative law judge issued a decision finding that Sheets was not disabled within the meaning of the Act.  (R.  29.)  On May 14, 2004, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R.  6-8.) On September 12, 2005, this Court remanded the case under the provisions of 42 U.S.C. §405(g), sentence 6, to consider the new and material evidence. *See* doc. 21.

On March 2, 2006, a second hearing was held pursuant to the remand order. Plaintiff, accompanied by counsel, appeared and testified. On April 13, 2006, the administrative law judge issued a decision finding that Sheets was not disabled within the meaning of the Act.  (R.  507-35.)  On February 23, 2007, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R.  1082-83.)

**Age, Education, and Work Experience**. Donald Sheets was born December 12, 1954 (R. 59.) He has a high school education. (R. 79.) He has worked as a maintenance worker and landscaper. He last worked December 1, 1998. (R. 73-74.)

**Plaintiff's Testimony**. The administrative law judge fairly summarized Sheets's testimony as follows:

> The claimant testified at the original February 2003 hearing that he lived with his girlfriend and her two teenage children. He graduated from high school. He had a driver's license and drove five to six times a week. He said that he last worked in 1998 in a maintenance job. He quit after he complained about apartment house residents throwing litter outside, he felt his life was threatened.

> The claimant alleged numerous physical and other impairments affecting his ability to work. He said he had problems with gripping with the left hand secondary to a remote stab wound to the arm (and chest). He could not see much out of the right eye, only about 20%. He had migraine headaches regularly. He took Tylenol and lay down when he had a migraine, and he may take as many as thirty Tylenol in one day. He had tried Imitrex in the past but it did not work. He had open heart surgery when he was young, and he now was having heart pains and rapid heart beat. There was pressure-like pain in his low back that he had every day. It was usually a four or five on a pain scale from one to ten with ten being the greatest pain, but it could be as high as ten at times. His right leg gave out sometimes and he did not want to climb ladders. He took multiple medications for various conditions, including for right side pain.

> Claimant also testified that he a nervous condition with anxiety attacks for which he took medication. He had been seeing a counselor every two months for the past year for anxiety and depression. He was depressed and avoided speaking with people. He had been taking Xanax for about a year. He also used an inhaler when he had panic attacks. The claimant reported that he found it difficult to sleep, and had gone as much as sixty hours at a time without sleep.

> Claimant, who lives with a girlfriend who he said was also ill, said that on a typical day he spent his time doing household chores and getting his

3

children off to school. He went to the grocery store early in the morning to avoid people. He went either with his girlfriend or by himself. He typically drove five to six times a week. He cooked two meals a day. He also helped with the laundry at times.

Claimant's presentation was very somatic during the first hearing (as it would be during the second hearing discussed below). Mild hand tremors were observed during the hearing.

Claimant testified at the second hearing in March 2006 that he had a pacemaker implanted in January 2004 following coronary bypass surgery. He had two blackouts shortly after it was implanted. Consequently, a defibrillator device was implanted instead in April 2004 (see Exhibit B-20F, page 8). Claimant alleged that he continued to have severe chest pains. A new device was implanted in December 2005 in order to relieve pressure caused on his collar bone by the old one (see Exhibit B-29F).

Claimant also testified that he had about eight bowel movements daily and typically spent about two and one-half hours in the bathroom. He reported a current weight of 196 lbs., though, which is virtually the same weight he reported at the 2003 hearing. Claimant also alleged that he had a burning type of pain in his stomach which he rated as a 6 to 7 on a 10 point severity scale. He had chronic back pain caused by all his anxiety attacks which he had twice a day. He also got dizzy spells several times a week. He had trouble holding on to small objects with his hands.

With reference to his depression, claimant testified that he heard voices of different people he knew. He only a shower about once every two weeks. He denied drinking any alcohol for two years. He said he had no friends and did not even watch television. He had stopped driving in December 2005 because he no longer felt safe driving. Despite his depression and anxiety, claimant had not received any counseling or other psychotherapy.

(R. 509-510.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

4

Medical Evidence Prior to October 2002: Physical Impairments.

William D. Padamadan, M.D. In September 2001, Dr. Padamadan examined plaintiff at the request of the Bureau of Disability Determination ("BDD"). (R. 138-45.) Plaintiff complained of acute pain in the right upper quadrant of his abdomen since 1997, although he had not sought treatment for it. (R. 138.) Plaintiff also reported that he had been stabbed a long time ago in the left, non-dominant hand, and his hand did not function as a result. *Id.* He reported that he drank only occasionally and reported a history of DUI six years prior. *Id.* He stated that he left his last job as a property maintenance person in 1997 unrelated to any medical reason. (R. 139.)

On examination, Dr. Padamadan noted hepatomegaly on abdominal exam, which could be the result of alcoholism. Dr. Padamadan concluded that plaintiff's tenderness of his right upper quadrant of his abdomen was not compatible with any organic disorder. (R. 140.) He found no limitations in plaintiff's physical abilities for work. (R. 141.)

Holzer Medical Center Emergency Room. In December 2001, plaintiff presented at the emergency room with complaints of abdominal pain. (R. 164-73.) He reported that he had had the pain for two years. (R. 165.) On exam, the abdominal area was normal other than guarding due to alleged pain in the right upper quadrant. *Id.* A right upper quadrant ultrasound was negative. (R. 166.) A urine screen was positive for benzodiazepines and opiates. *Id.* Abdominal x-rays were essentially negative. *Id.* Plaintiff also reported that he was anxious and that he felt like killing others, so he was

5

sent to Woodland Centers for a mental evaluation.  *Id.* Outpatient follow up was recommended after it was determined that plaintiff was "blowing off steam" and was not a danger to himself or others.  *Id.*  Bentyl was prescribed for plaintiff's abdominal pain, and Zoloft was prescribed for anxiety.  *Id.*

 John R.  Ellison, D.O. Dr.  Ellison examined plaintiff at the Holzer Clinic in February 2000 for complaints of chronic anxiety and prescribed Xanax.  (R.  179.) Plaintiff was seen again in August 2002 when he reported anxiety and upper quadrant abdominal pain.  (R.  178.) He was prescribed Xanax and Bentyl again.  *Id.*  In September 2002, plaintiff reported that his symptoms had improved with medication, although they were still present.  (R.  248.)


Medical Evidence Prior to October 2002: Psychological Impairments.

Alan White, Ph.D. Dr.  White performed a psychological evaluation on September 5, 2001. (R.  132-37.)  Plaintiff complained of fatigue, a recent change in sexual activity or interest in sex, feelings of helplessness and hopelessness, a loss of interest in activities formerly pleasing, a loss of interest in simple things like cleanliness of home or personal appearance, social isolation, crying spells, and being short tempered and snappy with others.  (R.  133.) He also reported generally feeling tense and uptight, forgetfulness, difficulty concentrating, frequent frustration, frequent headaches, bowel irregularities, trembling hands, avoidance of crowds and noises, restlessness, a preference to stay at home instead of going places alone, and generally

feeling like something bad is going to happen. *Id.* He denied any professional mental health treatment or therapy. *Id.* He had taken Valium and Xanax in the past, but he was not currently taking any medications. *Id.* He denied any history of substance abuse, although he reported a history of arrest for drunk driving. *Id.* He graduated from high school and had a driver's license. *Id.* He was divorced and currently lived with a girlfriend and her two children in a trailer. *Id.* He last worked for thirteen months in 1999 in property maintenance. (R. 134.) He left this job because of "nerves," difficulty with his vision, and pain in his side. *Id.*

With respect to daily activities, plaintiff said that he helped care for the children of his girlfriend, cooked, and performed housework. *Id.* He also shopped and performed heavy lifting occasionally. *Id.* He also reported that he could bathe, dress, and groom himself. *Id.* He reported difficulty falling asleep. *Id.* He stated that he does not socialize, and he has no hobbies. *Id.*

On mental status examination, plaintiff was guarded, resistant, and angry. *Id.* He was tense, and his facial expressions were strained. *Id.* He displayed poor eye contact. (R. 135.) His affect was irritable, but there were no autonomic signs of anxiety. *Id.* Plaintiff was oriented in all three spheres. *Id.* There was no evidence of psychotic features. *Id.* Plaintiff reported that he was easily annoyed and upset by others and that he often had urges to injure others. *Id.* He reported some suicidal ideation without any attempts, and he denied homicidal ideation. *Id.* He blamed others for his problems. *Id.*

7

His immediate and long term memory was intact.  *Id.* His insight, judgment, and abstract thinking ability were below average.  (R.  136.)

Dr.  White diagnosed dysthymic disorder and personality disorder, not otherwise specified with antisocial features.  *Id.*  He assigned a global assessment of functioning ("GAF") score of 60, which according to the Diagnostic and Statistical Manual of Mental Disorders, fourth edition, ("DSM-VI"), indicates moderate symptoms of impairment.  *Id.* Dr.  White noted that plaintiff had mild impairment in his ability to remember, sustain, concentrate, and attend.  (R.  137.)  Plaintiff had no limitation in following simple directions.  *Id.*  Dr. White also found mild impairment in social functioning and in the ability to tolerate the stress of normal work.  *Id.*

Vicki Casterline, Ph.D. Dr.  Casterline, a non-examining psychologist, reviewed the medical evidence of record in October 2001 for BDD and completed a psychiatric review technique form. (R.  147-63.)  She concluded that plaintiff had mild limitation in daily activities, moderate limitations in social functioning, and in concentration, persistence or pace.  (R.  158.)  Plaintiff had no repeated episodes of decompensation. *Id.*  Dr.  Casterline stated that plaintiff was markedly limited in his ability to deal with the public, and moderately limited in his abilities to complete a normal workday or week without interruption from any psychologically based symptoms, accept instruction or criticism from supervisors, and get along with co-workers without distracting them.  (R.  162.) She recommended that plaintiff not interact closely with others in the workplace and not be called upon to work rapidly or under frequently

8

changing conditions.  (R.  163.)  She also said that plaintiff could relate superficially toward others and tolerate routine changes in the work setting.  *Id.*

Dr.  Lacramioara Spetie, M.D.  Dr.  Spetie, a psychiatrist at Woodland Centers, treated plaintiff from August 7, 2002 through February 2003.  On August 7, 2002, plaintiff reported paranoia and hallucinations to Dr.  Spetie.  (R.  236.) He reported a history of heavy alcohol abuse, although he had reduced his drinking in the past few years.  (R. 239.)  Plaintiff complained of poor concentration and memory.  Dr.  Spetie diagnosed major depressive disorder, severe with psychotic symptoms, panic disorder with agoraphobia, and alcohol dependence by history, currently in stable remission.  (R. 240.)  She prescribed Paxil and Risperdal.  (R.  240.) Dr.  Spetie reported on August 8, 2002 that plaintiff's emotional and medical difficulties have been significantly interfering with his functioning for the past several years and affect his ability to deal with the pressures and expectations of a job.  (R.  175.)

Medical Evidence from October 2002 through April 2006: Physical Impairments.

Vishwanath N. Shenoy, M.D.  On October 10, 2002, Dr. Shenoy examined Sheets for abdominal complaints at the request of Dr. Ellison. Sheets did not have chest pain, but he experienced shortness of breath with physical exertion. His breath sounds were clear, but his heart rhythm was irregular. (R. 195.) Dr.  Shenoy suggested that plaintiff could be suffering from repeated attacks of pancreatitis secondary to hypertrig and that his symptoms could be secondary to pancreatic neoplasm, gastric neoplasm, peptic

ulcer or colonic neoplasm.  (R.  195.)  Dr.  Shenoy recommended an EGD and a colonoscopy.

An October 2002 computed tomography study of Sheets' abdomen and pelvis showed a liver hemangioma or benign tumor. (R. 185, 1000). Dr. Shenoy referred Sheets to a cardiologist, Dr. C. Lynn Linkous and recommended that he undergo a colonoscopy. (R. 193, 196.)  An EGD and colonoscopy showed a large hiatal hernia, hemorrhoids, and diverticulosis with a benign colon polyp. (R.  201.)

On December 30, 2002, Dr.  Shenoy stated that plaintiff jerks every time he touches his abdominal wall.  Dr. Shenoy stated that he could not determine the etiology of Sheets' abdominal pain. (R. 197.)  Sheets complained that he had been having severe right upper quadrant pain for several days. (R. 201.) Dr. Shenoy observed that "this degree of tenderness [was] out of proportion to his ultrasound[,] CT and lab findings." (R. 201.) He noted that wen he diverted plaintiff's attention and palpated the abdominal wall, Sheets did not show any tenderness. (R. 201.) His lungs were clear and he heart rhythm was regular with periods of irregular rapid heart beating. (R. 201.)  Recent laboratory tests revealed hiatal hernia, internal hemorrhoids, diverticulosis, and a benign colon polyp. (R. 201, 754.) Dr. Shenoy opined that Sheets' pain was likely due to a psychosomatic disorder and advised him to follow up with a psychiatrist at Woodland Center. (R. 992, 978.)

C. Lynn Linkous, M.D. Dr. Linkous, a cardiologist, examined plaintiff on October 21, 2002 to assess his cardiac condition prior to having a gastroesophago-duodenscopy and colonoscopy. (R. 193.)

A February 2003 stress EKG test demonstrated that the left ventricular function was low normal and that there was borderline right ventricular enlargement. (R. 254.) The motral, tricuspid, and pulmonic valves showed mild regurgitation, and the aortic valve was normal. (R. 254-55.) A CT scan of the chest showed some interstitial changes in the lung bases. (R. 270.) X-rays of the abdomen showed mild hepatomegaly but no acute process. (R. 271.) Other testing showed some stenosis in the superior vena cava and residuals of remote surgery. An EKG showed abnormal sinus rhythm, although medication was not necessary for the cardiac arrhythmia. Plaintiff had an episode of atrial tachycardial ablation, and medications were prescribed. Plaintiff also had significant sinus node disease, the doctor suspected that plaintiff had suffered from intermittent sinus arrest over time. (R. 279.) Because of residuals of plaintiff's previous surgery, a pacemaker was considered to risky. Instead, plaintiff was given an event monitor. *Id.*

On March 24, 2003, Dr. Linkous wrote that plaintiff had two holes in the upper chamber of his heart, and the vein draining the upper body into his heart was too small. (R. 285.) Dr. Linkous said that plaintiff had three abnormal electrical pathways which were cut recently. *Id.* On November 11, 2002, Dr. Linkous examined Sheets. His heart and lung sounds were unremarkable. (R. 194.) A cardiac perfusion imaging test showed

11

no obvious defects. (R. 759.) A Holter Monitor study showed increased heart rate coinciding with Sheets' complaints of rapid heart beat and nervousness. (R. 180-81, 997.) An EKG showed some thickening and/or calcification of an aortic valve leaflet, but it retained its mobility. (R. 182, 217.)

Holzer Medical Center. On January 14, 2003, Sheets was admitted to the hospital because of complaints of heart palpitations and shortness of breath. (R. 212-28, 980.) His heart and lungs sounds were unremarkable, and the attending physician observed that he was not in respiratory distress. (R. 212A.)  Blood chemistry profiles were within normal range within the normal range, and his cardiac enzymes were all normal. He reported that he did not experience headaches or migraines. Additional tests were ordered because he showed signs of chronic pulmonary disease. (R. 216.) Lung imaging indicated a low probability of pulmonary embolism, and clinical correlation was recommended. X-rays showed no definite acute infiltration of the lungs. (R. 765.) An EKG study showed a sinus tachycardia with second degree atrioventricular block. (R. 216.) Sheets was diagnosed with chronic obstructive pulmonary disease ("COPD"), which appeared to be stable; tobacco abuse; valvular heart disease; and possible obstructive sleep apnea. (R. 216.)

In August 2003, Sheets presented at the emergency room with complaints of epigastric discomfort. X-rays of the abdominal and pelvic areas were unremarkable. (R. 804, 806-08.) He returned to the emergency room with similar complaints three times the following week, but no significant abnormalities were detected. He had episodes of

12

vomiting and diarrhea. (R. 826, 833.)  The doctors could not determine the cause of his complaints. (R. 828.)

John R.  Ellison, D.O. An October 2002 CT scan of the abdomen showed a small liver lesion consistent with hemangioma, but no other abnormal findings.  (R. 185.) Liver enzymes were normal.  A cardiac evaluation was completed because of plaintiff's history of cardiac surgery as a child.  An echocardiogram showed thickening and/or calcification of one of the aortic valve leaflets with retained mobility  (R. 182.) An EKG showed sinus tachycardia.

On October 25, 2002, Dr.  Ellison reported that plaintiff had "substantial improvement of his abdominal discomfort with Bentyl."(R. 192.)

On January 24, 2003, Sheets reported to Dr. Ellison that Bentyl had provided some relief with respect to his right upper quadrant pain. Dr. Ellison discontinued the Bentyl and tried a different medication in addition to adding a fiber supplement. (R. 977.)

On February 27, 2003, Dr.  Ellison completed a medical findings questionnaire. (R.  250-51.) Dr.  Ellison indicated that plaintiff's current status was stable and that treatment had improved his symptoms. (R.  250.)  Dr.  Ellison also reported that he anticipated that plaintiff's condition would improve over the next twelve months.  (R. 251.)

On September 25, 2003, Dr. Ellison completed an assessment of Sheets' ability to perform work-related activities. He wrote "unable to perform any activities" and did not complete the entire form. (R. 412-16.)

Santpal S. Mavi, M.D. On January 14, 2003, plaintiff was admitted to the Holzer Medical Center through Dr. Linkous's office. Dr. Mavi examined plaintiff on January 14, 2003 for complaints of palpitations and shortness of breath. (R. 215.) Plaintiff reported a history of smoking three to four packs of cigarettes a day and was trying to cut down to one pack a day. *Id.* A chest x-ray was unremarkable. *Id.* Acute respiratory illness was ruled out. *Id.* There were symptoms suggesting chronic bronchitis and chronic obstructive pulmonary disease. *Id.* Dr. Mavi recommended a pulmonary function study and overnight pulse oximetry study for sleep apnea. (R. 216.) He strongly advised plaintiff to stop smoking. *Id.*

On January 30, 2003, Dr. Mavi stated that Sheets was doing fairly well and strongly recommended that he quit smoking. (R. 977.)

In February, March, and April 2003, Sheets underwent a series of ablation procedures and laboratory tests. EKG studies showed elevated pulmonary artery systolic pressure which could be related to his heart defect. (R. 254, 261.) The right ventricle and right and left atrium were mildly dilated. (R .254, 261.) Mild pulmonic valvular regurgitation was noted. (R. 255, 262.) A March 2003 cardiac stress test failed to produce maximal results due to his reduced exercise capacity. (R. 253.) A thirty-day event monitor did not reveal significant tachycardia. (R. 780.)

14

On April 1, 2003, Dr. Mavi examined Sheets and noted scattered wheezes and poor air movement. (R. 959.)

Curt J. Daniels, M.D. On May 19, 2003, Dr. Daniels completed a medical findings questionnaire. He opined that Sheets could lift ten to twenty pounds occasionally. He believed that plaintiff had the ability to stand/walk for bless than one hour and to sit from 2 to 3 hours. He could never climb, kneel, or crawl.  Dr.  Daniels also indicated that plaintiff could not push or pull, or be around moving machinery, temperature extremes, chemicals, or humidity.  He also noted that plaintiff needs rest periods during the day.  (R.  309-10.)

Two weeks following hospitalization for right and left heart catherization and implantation of a pacemaker, Sheets reported that he was experiencing chest wall tenderness at the site of the incision. (R. 894.) Even minimal activities caused fatigue. He experienced episodes of spontaneous sweating. (R. 894.) He was doing well on his medications. (R. 894.) His heart rate and rhythm were normal. Dr. Daniels noted that Sheets appeared "quite debilitated." (R. 895.)

On January 14, 2004, Dr. Daniels completed an assessment of Sheets' ability to perform work-related activities. (R. 1047.)  He opined that Sheets could only lift up to five pounds occasionally, stand/walk for two to three hours, and sit for only three to four hours during the day. (R. 1047.) He indicated that Sheets could never climb or balance, and he could only occasionally stoop, crouch, kneel, or crawl. (R. 1048.) He

15

concluded that Sheets required ten to fifteen minute rest periods for every two to three hours during the day. *Id.*

On March 24, 2004, Dr. Daniels opined that Sheets could not lift more than five pounds occasionally, stand more than one hour, or sit more than two hours. (R. 888-89.)

In June 2004, Sheets complained of fatigue and shortness of breath with minimal exertion. (R. 1078.) His heart and lung sounds were normal. He denied having palpitations. (R. 1079.) Dr. Daniels recommended that Sheets enrol in a cardiac rehabilitation program or engage in regular exercise. (R. 1079.)

John D. Hummel, M.D., F.A.C.C. On May 2, 2003, Dr. Hummel reviewed Sheets' 30-day event monitor. Sheets had normal sinus rhythm or sinus rhythm with PACS during the episodes he identified as experiencing fatigue, chest pain, shortness of breath, and fluttering. No significant tachycardia was noted. (R. 368.)

Raul Weiss, M.D., F.A.C.C.  In a May 23, 2003 letter to Dr. Linkous, Dr. Weiss indicated that Sheets' cardiac studies revealed abnormally long QT intervals, which he believed were caused by his psychotropic medications. (R. 366-67.)

Robert Sams, M.D. On  May 13, 2003, Dr. Sams completed a medical findings questionnaire and noted that plaintiff had shortness of breath due to cardiac insufficiency. His physical activities were severely limited due to chest discomfort, and functional capacity was not performed due to hematoma in heart.  (R.  317-19.)

James H, Caldwell, M.D. On October 21, 2003, Dr. Caldwell examined Sheets at the request of Dr. Ellison. Plaintiff reported chronic fatigue, episodes of bradycardia,

16

and dyspnea as well as digestive and abdominal pain symptoms.  (R.  431-33.) Dr.
Caldwell noted tenderness to palpation of the right upper quadrant, but Sheets was less
"hyperreactive" when he was distracted. (R. 431-32.) Dr. Caldwell suggested that
Sheets' pain was myofascial in nature. (R. 432.)

Christopher T. Meyer, D.O. On November 12, 2003, Dr. Meyer, a
gastroenterologist, examined Sheets. He diagnosed irritable bowel syndrome. (R. 936.)

The Ohio State University Hospital. On December 25, 2003, Sheets was admitted
to the hospital because of fatigue and bradycardia with sinus arrhythmia. He
underwent right and left heart catheterization and cardiac CT, and it was determined
that he had a sinus venosus type residual atrial septal defect with a stenosis of the
superior vena cava at the SVC-RA junction.  He received a pacemaker. (R. 437-43.)

Robert E. Norris, M.D.  On February 17, 2004, Dr. Norris, a state agency
physician, reviewed the medical evidence of record and completed physical residual
functional capacity assessment. (R. 1027-31.) Dr. Norris concluded that Sheets had the
capacity to lift and carry twenty pounds occasionally and ten pounds frequently. On
July 29, 2004, W. Jerry McCloud, M.D. reviewed the evidence of record and concurred
with Dr. Norris's opinion. (R. 1031.)

David L. Chan, M.D. On April 5, 2004, Dr. Chan removed the pacemaker and
implanted a defibrillator. (R. 914-15.) Several weeks following the procedure, Sheets
complained of pain at the implant site. He also had increased abdominal discomfort. (R.
920.) An April 2004 chest x-ray showed that plaintiff had an enlarged heart. (R. 925.)

17

In October 2004, Sheets was treated at the Ohio State University Medical Center for complaints of pain at the implant site. There was no evidence of swelling or discoloration at the implant site or on his left arm. (R. 1052.) In December 2005, Sheets' defibrillator was replaced because of his complaints of pain. (R. 1050-52, 1058-62).

Medical Evidence from October 2002 through April 2006: Mental Impairments.

Dr.  Lacramioara Spetie, M.D.   On October 10, 2002, a nurse at the Woodland Centers noted that plaintiff's mood had somewhat improved, although he still experienced anxiety, agitation, and ongoing panic attacks.  (R. 233.)  On January 23, 2003, Mr.  Sheets told Dr.  Spetie that he experienced significant mood lability, irritability, and agitation.  He was cooperative and maintained good eye contact.  His mood was dysphoric, anxious, and depressed.  (R. 245.)  He was suffering from significant insomnia.

On January 23, 2003, Dr.  Spetie wrote to plaintiff's attorney that Mr.  Sheets continued to struggle with chronic and disabling impairment in most areas of his life including self-care, interpersonal relationships, and other responsibilities that affect his functioning.  (R.  229.)  She also stated that plaintiff will require long term, intensive mental health services.  *Id.*  On January 30, 2003 Dr.  Spetie reported that plaintiff has had several episodes of increased confusion at night, and he reported that he saw his deceased friends several times. (R.  230.) On February 14, 2003 Dr.  Spetie made a medical assessment of Mr.  Sheets's mental ability to do work-related activities.  She stated that plaintiff continued to report severe depression, but he denied any recent

18

suicidal or homicidal ideation.  He reported rare episodes of auditory hallucinations.

She assigned a GAF score of 50-55, which indicates serious to moderate symptoms of

social or occupational impairment.  (R.  241, 244.) She also completed a mental

capacities assessment indicating all work-related abilities to be "fair" or "poor or

none."(R. 242.) On February 12, 2003, Dr.  Spetie's office notes state that Mr. Sheets

complained pf psychomotor retardation.  He was rather disheveled.  His affect was

anxious, depressed, and at times tearful.  (R.  244.)

     <u>Karen Stailey Steiger, Ph.D.</u> On March 25, 2004, Dr. Steiger, a state agency

psychologist, reviewed the medical evidence of record and assessed Sheets' functioning

in work-related activities based on his depression and anxiety. (R. 1009-25.)  Dr. Steiger

found that Sheets had mild restriction of activities of daily living and moderate

limitations in maintaining social functioning and maintaining concentration,

persistence, or pace. She found moderate limitations in his ability to understand and

remember detailed instructions; to carry out detailed instructions; to maintain attention

and concentration for extended periods; and to perform activities within a schedule,

maintain regular attendance, and be punctual with customary tolerances. She also

found that he was moderately limited in his ability to complete a normal workday and

workweek without interruptions from psychologically and to perform at a consistent

pace without an unreasonable number and length of rest periods. He was moderately

limited in his ability to interact appropriately with the general public; to maintain

socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others.

Dr. Steiger concluded that Sheets retained the mental capacity to learn, perform, and concentrate on some simple and moderately complex tasks. He was able to drive, go to the store, and supervise children. She opined that he could work if he were not subjected to strict time or production demands.

On July 27, 2004, Donna E. Winter, Ph.D. reviewed the evidence of record and concurred in the assessment of Dr. Steiger. (R. 1009.)

Sheila Emerson Kelly, M.A. In February 2006 Ms. Kelly, a licensed psychologist, evaluated Sheets at the request of his attorney. Ms. Kelly described him as "mildly demented." (R. 1037.) Ms. Kelly administered an intelligence test, and Sheets scored in the borderline range. She noted that Sheets was mildly to moderately anxious and mildly depressed. She concluded that his psychological problems interfered with his day-to-day life and his ability to function. She diagnosed him with panic disorder with agoraphobia by self-report; depressive disorder, not otherwise specified; generalized anxiety disorder; a history of alcohol dependence, in remission by self-report, borderline intellectual functioning; limited literacy; and personality disorder, not otherwise specified, with paranoid, dependent, passive-aggressive, obsessive, and avoidant features.

She found that Sheets was moderately limited in his abilities to remember work-like procedures and to understand and remember very short and simple instructions,

20

and he was extremely limited in his ability to understand and remember detailed instructions. He had moderately limitations in his ability to carry out very simple instructions and to sustain an ordinary routine without special supervision. He was markedly limited in his ability to maintain attention for extended periods; to maintain regular attendance and be punctual within customary tolerances; to work in coordination or proximity to others without being unduly distracted by them; and to make work-related decisions. He was extremely limited in his ability to carry out detailed instructions. With respect to social interaction, Ms. Kelly found moderate limitations in his ability to ask simple questions or request assistance. She found that he was moderately limited in his ability to interact appropriately with the general public; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. He was extremely limited in his ability to accept instructions and respond appropriately to criticism from supervisors. With respect to adaptation, he was moderately limited in his ability to respond to changes in a routine work setting, and he was markedly limited in his ability to travel in unfamiliar places or use public transportation and to set realistic goals.

**Administrative Law Judge's Findings.**

1.  The claimant met the disability insured status requirements of the Act on December 1, 1998, the date claimant stated claimant became unable to work, and continued to meet them through December 31, 1998.

2.  There is no evidence that the claimant has engaged in substantial gainful activity since his alleged onset date.

3.  The medical evidence establishes that the claimant has the following severe impairments: dysthymia, generalized anxiety disorder, personality disorder NOS, and since October 2002, congenital heart disease.

4.  The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4.

5.  The claimant's subjective allegations lack credibility to the extent that they purport to describe a condition of disability within the meaning of the Social Security Act and Regulations.

6.  From the alleged disability onset date (December 1998) until October 2002, the claimant lacked the residual functional capacity to: (1) have contact with members of the public; or (2) have greater than occasional contact with supervisors or co-workers (i.e., no job where he required to work as part of a team). Therefore he could performed work at all levels of exertion with those nonexertional restrictions (20 CFR 404.1545 and 416.945).

    Since October 2002, the claimant has further lacked the residual functional capacity: (3) to lift more than 10 pounds frequently or 20 pounds occasionally; (4) perform greater than occasional climbing of stairs or any climbing of ladders or scaffolds; (5) work at unprotected heights to temperature extremes, wet or humid areas, fumes, smoke, dust, odors, or poor ventilation. There he is currently limited to a reduced range of light exertional work.

7.  The claimant has been unable to perform his past relevant work as a building maintenance repairer at any time relevant to this decision.

8.  The claimant was born on December 12, 1954. He was 43 at the alleged onset date and considered to be a "younger individual." He turned 50 on December 12, 2004, and is now "closely approaching advanced age" ( 20 CFR 404.1563 and 416.963).

9.    The claimant has a high school education (20 CFR 404.1564 and 416.964).

10.   The claimant does not have any acquired work skills which are transferable to other jobs within claimant's residual functional capacity (20 CFR 404.1568 and 416.968).

11.   For the period prior to October 2002, if a claimant's non-exertional limitations did not significantly compromise his ability to perform work at all defined exertional level, section 204.00, Appendix 2, Subpart P, Regulations No. 4, would provide that a finding of "not disabled" is appropriate. If the capacity to work at all exertional levels was significantly compromised, the remaining work which he is functionally capable of performing is considered in combination with his age, education, and work experience to determine whether a work adjustment can be made. For the period since October 2002, when, the claimant is limited to light work, Vocational Rules 202.21 (ages under 50) and 202.14 (ages 50 through 54), Table No. 2, Subpart P. Regulations No. 4, provide that a person with the above described vocational profile who is restricted to doing the full range of light work is to be considered as "not disabled" for Social Security.

12.   For the period prior to October 2002, there was at least 1,600 sedentary jobs, such as addresser and lens inserter, 8,000 light exertion jobs such as laundry folder and farm worker, and 25,000 medium exertion jobs such as commercial keeper and groundskeeper, that could have been performed in the regional economy of Fayton, Ohio, and a proportionate number of such exist at the national level as well.

      For the period since October 2002, there has been at least 1,500 sedentary jobs such as sprayer assembler and wire insulator and 8,000 light exertion jobs such as a small parts assembler that could be performed in the Dayton, Ohio, region, and a proportionate number of such jobs exist at the national level as well.

13.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 533-35.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed reversible error in determining that Sheets' stomach impairment was not a medically determinable impairment. Sheets argues that the administrative law judge improperly relied on the opinions of Drs. Shenoy and Caldwell by concluding his abdominal or

24

gastrointestinal impairment was not medically determinable because there was no organic basis for his complaints. Dr. Shenoy opined that Sheet's upper quadrant pain was the result of a psychosomatic disorder.  Dr. Caldwell believed that Sheets' abdominal pain was myofasical and that psychological factors were significant. Sheets maintains that the record is replete with evidence support a psychological basis for his condition, but the administrative law judge seemed to equate the somatic nature of his impairment with a lack of credibility. Sheets argues that simply because the source of his pain may be psychological rather than physical, it does not mean that he has exaggerated his symptoms.

- The administrative law judge failed to consider the combined impact of Sheets' multiple impairments. Sheets argues that the combined impact of his impairments play a significant role in demonstrating that he is disabled. According to Sheets, there is a clear connection between his mental health and his physical impairments. His pain condition is exacerbated by his mental conditions. Sheets makes a similar argument with regard to his knee pain. Sheets further maintains that his back condition constitutes a severe impairment when coupled with his mental impairments. Sheets argues that the excruciating pain he experienced following the insertion of the defibrillator was clearly the result of his mental condition because his doctors could find no physical abnormality. Sheets further argues that his heart condition was

exacerbated by his anxiety. His headaches were stress-induced. Even if the

administrative law judge correctly concluded that his irritable bowel

syndrome, headaches, panic disorder, COPD, stomach problems, back

condition, and cognitive functioning were not severe impairments, he was still

required to consider the combined effects of these conditions.

- The administrative law judge failed to properly weigh the opinions of Sheets'

  treating and examining physicians. Sheets argues that the administrative law

  judge did not apply the factors outlined in 20 CFR §§ 404.1527(d) and

  416.927(d). He also contends that the administrative law judge did not

  determine whether Dr. Spetie's opinion was well supported by medically

  acceptable clinical and laboratory techniques and if it was consistent with

  other substantial evidence in the record. He also maintains good reasons for

  rejecting Dr. Spetie's opinion were not provided. Sheets also argues that the

  administrative law judge improperly dismissed the opinion of Ms. Kelly, an

  examining psychologist based on the false notion that she relied on Sheet's

  self-report, which the record had shown to be unreliable.

  Sheets also contends that the administrative law judge did not properly

weigh the opinions of the reviewing sources and the mental health examiner.

He argues that the regulations provide progressively more rigorous tests for

weighing opinions as the ties between the source of the opinion and the

individual become weaker.

26

Sheets argues that the administrative law judge played the role of a medical expert in second guessing plaintiff's treating doctors and asserting that Sheets' hymodynamics were solved by the defibrillator. If the administrative law judge had doubts about whether Sheets continued to have physical impairments, he should have contacted the medical sources to clarify the issues.

- <u>The administrative law judge did not properly evaluate Sheets' credibility</u>. Sheets maintains that the administrative law judge ignored the factors necessary to evaluate his credibility, including his limited daily activities, the nature, location, frequency, intensity and duration of his symptoms, his precipitating and aggravating factors, and his medication regimen. Rather than rely on the factors as required by the regulations, the administrative law judge relied on other factors that should have had no bearing on assessing his credibility. For instance, the administrative law judge relied on the fact that he concluded that some of Sheets' alleged impairments were not severe. He also considered his history of substance abuse.

**Analysis**.

Sheets maintains that the administrative law judge erred when he found that his stomach impairment was not a medically determinable impairment. The administrative law judge stated that "[b]efore a symptom may be considered in determining a particular claimant's functional capacity to work, it must be established that such a

27

symptom is the result of a specific medical condition (SSR 96-7p and 96-8p)." (R. 519.)

With respect to his stomach problems, the administrative law judge stated:

> I find that there is no medically-determinable abdominal or gastro-intestinal impairment in this record. The claimant has made chronic complaints of upper right abdominal pain, seemingly the main allegation of impairment reported to Dr. Padamadan, the examining source for the BDD. This was also his major complaint to doctors at the Holzer Clinic in the early record and continuing later. The evidence with respect to these complaints is summarized above, and several doctors (including two GI specialists, Dr. Shenoy and Dr. Caldwell) have expressed the opinion that he is less than credible on the issue and that there is no organic basis for his complaints (Exhibit 11F at 1 in December 2002 by Dr. Shenoy -- "degree of tenderness is out of proportion" to the diagnostic imaging tests of the abdomen and pelvic region and multiple internal tests and that "on diverting his attention, I palpitated his abdomen wall and he did not have any tenderness." See also comments by Dr. Caldwell in December 2004 (Exhibit AC-6) where he reports the claimant's alleged pain to be far less when the doctor distracted him. Dr. Caldwell concluded that there was no evidence of any internal condition and his complaints were of a musculoskeletal nature.
>
> Notably, on questioning by his attorney at the second hearing, the claimant recited eight impairments . . . . He failed to mention abdominal pain until he was asked to discuss his medication regimen and then he mentioned he took one of the medications for his right side pain. This medication was Percocet, which he was found to be abusing late in the record and goes a long way to explaining his spate of emergency room visits in August 2003 for which he received narcotic medications despite being found to be in no distress by examiners (Exhibit B-9F through B-12F).
>
> In sum, I find claimant's subjective symptoms not to be credible with respect to alleged abdominal gastrointestinal, and musculoskeletal pain symptoms.

(R. 521.)

Plaintiff's argument is circular. He seems to argue that the administrative law judge failed to consider his stomach impairment because it was psychologically-based.

The administrative law judge did, however, conclude that Sheets had a mental impairment that was severe and considered his stomach problems related to that impaiment. According to Sheets, the administrative law judge should have concluded that he had a physical impairment because his psychological impairment manifested in somatic complaints. Instead, the administrative law judge considered his stomach problems the result of his mental impairment. I conclude that there is substantial evidence in the record to support the administrative law judge's finding that stomach problems were attributed to his mental impairment, and he did not err when he concluded that Sheets' stomach problems did not constitute a severe physical impairment.

     Combined impairments.  The Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.  42 U.S.C. § 423(d)(2(B).  *See*  42 U.S.C. § 1382c(a)(3)(B); *Nash v. Sec'y of Health and Human Serv.*, 59 F.3d 171 (Table) 1995 WL 363381, at *2 (6th Cir. June 15, 1995);  *Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993) (citing case law which states that the claimant "should be evaluated as a whole person, and not evaluated in the abstract as having several hypothetical and isolated illnesses.").  The Commissioner's regulations provide:

> In determining whether your physical or mental impairment or impair-
> ments are of a sufficient medical severity that such impairment or
> impairments could be the basis of eligibility under the law, we will
> consider the combined effect of all your impairments without regard to
> whether any such impairment, if considered separately, would be of

> sufficient severity. If we do find a medically severe combination of
> impairments, the combined impact of the impairments will be considered
> throughout the disability determination process. If we do not find that
> you have a medically severe combination of impairments, we will
> determine that you are not disabled.

20 C.F.R. § 404.1523.

When an administrative law refers to a claimant's combined impairments, he has

met his obligation to consider the claimant's impairments in combination. *See, Loy v.*

*Secretary of Health and Human Services,* 901 F.2d 1306, 1310 (6th Cir. 1990).

Sheets argues that the administrative law judge failed to consider the combined

impact of his impairments. The administrative law judge formulated a residual

functional capacity that included limitations based on his mental impairment prior to

October 2002 and his physical and mental limitations since October 2002. The

administrative law judge concluded that plaintiff's abdominal, gastrointestinal, and

musculoskeletal pain complaints were not credible. The administrative law judge

incorporated the combined impact of those impairments that he found credible.

Furthermore, he specifically found that "[t]he claimant does not have an impairment or

combination of impairments listed in, or medically equal to one listed in Appendix 1,

Subpart P, Regulations No. 4." (R. 533.)

Treating Doctors' Opinions.  Plaintiff argues that the Administrative Law Judge

erred in rejecting the opinions of Dr. Spetie , Ms. Kelly, Dr. Daniels, and Dr. Ellison.

A treating doctor's opinion on the issue of disability is entitled to greater weight

than that of a physician who has examined plaintiff on only one occasion or who has

merely conducted a paper review of the medical evidence of record.  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.  *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975).  20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."  20 C.F.R. § 404.1527(d)(1).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length

of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §404.1527(d)(2)(i).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.  Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.  A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support

the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th

Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may

reject the treating doctor's opinions when "good reasons are identified for not accepting

them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We

will always give good reasons in our notice of determination or decision for the weight

we give your treating source's opinion"); *Wilson v. Commissioner of Social Security*, 378

F.3d 541, 544 (6th Cir. 2004). The Commissioner must make the final decision on the

ultimate issue of disability. *Duncan v. Secretary of Health and Human Services*, 801 F.2d

847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d

954, 958 n.1 (11th Cir. 1982).

The administrative law judge properly applied that standard for evaluating the

opinion of a treating doctor to Dr. Spetie's opinion:

> I recognize that claimant's one-time treating psychiatrist, Dr. Spetie,
> once stated that claimant was substantially impaired by severe depression
> with psychotic features. However, Dr. Spetie only saw the claimant
> occasionally in late 2002 through 2003, when the claimant stopped seeing
> her. She understandably relied on claimant's self-report of symptoms at
> the initial evaluation (in August 2002) in making her diagnoses at that
> time (major depressive disorder, moderate, severe with psychotic
> symptoms; panic disorder with agoraphobia; and alcohol dependence by
> history currently in stable remission). She continued those diagnoses
> (though having dropped the one related to history of alcohol dependence)
> through the end of her records. Yet, visits during 2003 showed that he
> responded well to medication, and she reported that his psychosis and
> panic attacks had improved (Exhibits B-14F and AC-1). She prescribed
> Paxil and Risperdal, and noted throughout her records that Lithobid was
> prescribed by Dr. Ellison. However, Dr. Ellison's records do not show that
> he prescribed Lithobid, and he only prescribed Xanax on a regular basis,
> of which Dr. Spetie was apparently unaware (see Dr. Ellison's records

34

from late 2002 through 2003 –Exhibits 15F, AC-2, AC-5, and AC-6). There are no further visits with Dr. Spetie documented after 2003. I find that her assessment is disproportionate to any objective findings in the record, and she likely placed claimant on medications that he did not require and that may have contributed to the aggravation of his cardiac symptoms.

Essentially, Dr. Spetie did not report objective findings other than some evidence of anxiety. Her records do not support her reported opinion in August 2002 that "emotional and medical difficulties have been interfering significantly with Mr. Sheet's functioning for the past several years and at this time affect his ability to deal with the pressures and expectations of a job" (Exhibit 6F). She then said that he would benefit greatly from the medical coverage provided by the Medical Card" for ongoing medical treatment. Her statements are not a definitive opinion that the claimant was disabled and certainly not solely due to his psychological impairment alone.

. . . The treatment record though shows that Dr. Spetie had only done a cursory evaluation of the claimant during the infrequent visits. Although she included psychotic features with her diagnosis of depression, she did not indicate the need for psychiatric hospitalization. There is no evidence that the claimant has had any therapy/counseling sessions (Dr. Spetie just saw him for medication. He vaguely alleged at the hearing that this had to do with not having significant medical insurance coverage for greater treatment. However, there are county mental health services available to the indigent.

(R. 528-29.) The administrative law judge considered the length of the treatment relationship, the nature and extent of the treatment relationship, supportability, consistency, and in addition to other factors. Consequently, there was substantial evidence supporting the administrative law judge's decision to reject Dr. Spetie's opinion.

The administrative law judge rejected the opinion of Ms. Kelly because she had relied heavily on Sheets' self-reports, which the administrative law judge found to

35

be not credible. Furthermore, Ms. Kelly was an examining psychologist, rather than a treatment provider. (R. 529.)

With respect to Drs. Daniels and Ellison's opinions, the administrative law judge stated:

> It is not clear that Dr. Daniels had much of a treating relationship with claimant as of the date of his May 2003 residual functional capacity assessment. As of the time of his March 2004 assessment it should be noted that claimant was still using the pacemaker that had to be replaced the following month. . . . In June 2004, Dr. Daniels examined claimant. A cardiovascular examination revealed a regular rate and rhythm  with a normal S1 and S2. Once more, Dr. Daniels stated his report that claimant's April 2004 stress test was normal. There was no current evidence of any restrictive process, and claimant current evidence of any restrictive process, and claimant currently denied any palpitations. He did not that claimant was very deconditioned with minimal activity tolerance. He recommended a cardiac rehabilitation program or at least a regular exercise program at home, but the next requested follow-up was not for six months. The claimant was not taking any cardiac medications at the time per doctor report, including any Nitroglycerin.
> It is thus evidence that Dr. Daniels had no basis himself for giving any kind of functional capacity assessment in May 2003, and it may well be that in fact it was given a year later and the state year is a clerical error. There is no doubt that as of the time of the March 2004 assessment claimant was extremely limited on a short term basis, and likely was so for the time period extending from December 2003 up until June 2004. However, by the time of claimant's last visit with Dr. Daniels in June 2004, claimant was no doing well with no recurrent cardiac symptoms, and all his objective cardiac symptoms were back to normal. Thus I find that Dr. Daniels' assessments are not entitled to controlling or deferential weight to the extent that they purport to reflect a long term residual functional capacity for the time extending beyond the early spring of 2004 or before late 2003.
> A similar analysis applies to Dr. Ellison's assessment. Dr. Ellison himself reported that claimant was doing well by January 2003 now that treatment had resumed (Exhibit 16F). Some further studies were in fact required, though, with some continuing problems through April of 2003. The treatment record reflects no ongoing cardiac symptoms between the

36

> spring of 2003 and the end of 2003, and none after the spring of 2004. His
> assessment thus lacks the necessary supportability and consistency to
> entitle it to any deferential, let alone, controlling weight for Social
> Security long term disability assessment purposes.

(R. 527-28.)  Consequently, the administrative law judge gave adequate reasons for

failing to give significant weight to the opinions of Drs. Spetie, Daniels, Ellison, and Ms.

Kelly.

Credibility Determinations. Pain is an elusive phenomena.  Ultimately, no one

can say with certainty whether another person's subjectively disabling pain precludes

all substantial gainful employment.  The Social Security Act requires that the claimant

establish that he is disabled.  Under the Act, a "disability" is defined as "inability to

engage in any substantial gainful activity by reason of any medically determinable or

mental impairment which can be expected . . . to last for a continuous period of not less

than 12 months.  . . ."  42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall not
> alone be conclusive evidence of disability as defined in this section;
> there must be medical signs and findings, established by medically
> acceptable clinical or laboratory diagnostic techniques, which show
> the existence of a medical impairment that results from anatomical,
> physiological, or psychological abnormalities which could
> reasonably be expected to produce the pain or other symptoms
> alleged and which, when considered with all evidence required to be
> furnished under this paragraph (including statements of the
> individual or his physician as to the intensity and persistence of such
> pain or other symptoms which may reasonably be accepted as
> consistent with the medical signs and findings), would lead to a
> conclusion that the individual is under a disability.  Objective
> medical evidence of pain or other symptoms established by

medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide:

(a) *General*.  In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c).  By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e).  These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.  We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.  However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.  In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you.  (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.)  We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be

> accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a).

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) the Sixth Circuit established the following test for evaluating complaints of disabling pain.  First, the Court must determine "whether there is objective medical evidence of an underlying medical condition."  If so, the Court must then

> examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ."  *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987).

The administrative law judge found that Sheets was not fully credible on multiple issues. He relied on Sheets' inconsistent reports and denials of his past alcohol use. In 2001, Sheets tested positive for benzodiazepines and opiates in the emergency room.  Dr. Ellison stopped prescribing Percocet based on Sheets' misuse of the prescription. Plaintiff reported to Dr. Ellison that he was self-employed in 2001 although he stated that he became disabled in 1998.  The administrative law judge also noted that plaintiff stopped working in 1998 because people were threatening him rather than on the basis that he was disabled from work activity.  The administrative

law judge also found no evidence of significant and ongoing adverse side effects from treatment or medication.

The administrative law judge also relied on his conclusions with regard to what constituted Sheets' severe impairments. With respect to Sheets' abdominal pain, the administrative law judge found it significant that when Dr. Shenoy diverted Sheets' attention, his tenderness decreased significantly.  Dr. Caldwell also noted that Sheets' alleged pain was far less when distracted. The administrative law judge also noted that when asked to identify his impairments, he initially failed to name his abdominal pain.

With respect to plaintiff's alleged knee impairment, the administrative law judge noted that there was no positive findings on clinical exam, and a x-ray was negative. (R. 520.) He also concluded that there was no functionally limiting severe back impairment. Although a May 2004 CT scan showed some degenerative changes, there was no evidence of any chronic or significant complaints to his treating doctor. There was no treatment for this condition, and Dr. Padamadan, an examining doctor, concluded that he could sit, stand, and walk. Consequently, there is substantial evidence in the record supporting the administrative law judge's finding that Sheets' subjective symptoms were not credible with respect to his abdominal, gastrointestinal, and musculoskeletal pain symptoms.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social

Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  *See* 28 U.S.C. §636(b)(1)(B); Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150-152 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *See also Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


 s/Mark R.  Abel
United States Magistrate Judge